1  Alison E. Chase (SBN 226976)
2  KELLER ROHRBACK L.L.P.
   801 Garden Street, Suite 301
3  Santa Barbara, CA 93101
   (805) 456-1496, Fax (805) 456-1497
4  achase@kellerrohrback.com

5

6  *Attorneys for Plaintiffs and the Putative Class*

7  Additional Counsel Listed on Signature Block

8              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
9                SAN FRANCISCO DIVISION

10
   Nancy Paperno and Robert Gibbany, individually          No.
11 and on behalf of all others similarly situated,
                                                           **CLASS ACTION COMPLAINT**
12                                        Plaintiffs,

13          v.                                             **DEMAND FOR JURY TRIAL**

14
   Whirlpool Corporation,
15
16                                        Defendant.

17

18              **I.     CLASS ACTION COMPLAINT**

19          Plaintiffs Nancy Paperno and Robert Gibbany, individually and on behalf of all others

20 similarly situated, hereby file suit against Defendant Whirlpool Corporation, and respectfully allege the

21 following:

22              **II.     INTRODUCTION**

23          1.      This class action involves Defendant Whirlpool Corporation's ("Whirlpool") design,

24 manufacture, and sale of French door refrigerators with a hidden design defect that causes the

25 refrigerator compartment's evaporator to periodically frost or freeze over, which triggers the

26 refrigerator to stop cooling properly. For years, Whirlpool has knowingly sold the defective French

27 door refrigerators to consumers without ever disclosing the defect's presence. As a result, innocent

28

consumers across California have suffered significant economic damages, including overpaying for defective French door refrigerators that fail to perform their ordinary and intended purpose.

2.      The defective French door refrigerators at issue, which were designed, manufactured, distributed, marketed, and/or sold by Whirlpool under various brand names, include the following refrigerator models with serial numbers from K212 to Present that contain a dual evaporator cooling system (the "Class Refrigerators")[1]:

**Whirlpool:**    WRF757SDE*; WRF767SDEM*; WRF989SDA*;
WRF990SLA*; WRV976FDEM*; WRV986FDEM*;
WRV996FDE*; WRX988SIBM*; WRX986SIHZ*

**KitchenAid:**    KFIS29BB*; KFIS29PBM*; KFIV29PCM*; KRFF507E*;
KRFF707E*; KRMF606E*; KRMF706E*

**JennAir:**    JFX2897DR*

**Maytag:**    MFT2776DEE*; MFT2776FEZ*; MFT2778EE*; MFT2976AE*;
MFT2977AE*; MFX2676FRZ*; MFX2876DR*;

### III.    PARTIES

3.      Plaintiff Nancy Paperno is a citizen and resident of Livermore, California.

4.      Plaintiff Robert Gibbany is a citizen and resident of Livermore, California.

5.      Plaintiffs Nancy Paperno and Robert Gibbany are, and all times relevant herein were, husband and wife.

6.      Defendant Whirlpool Corporation ("Whirlpool") is a Delaware corporation with a principal place of business of Benton Harbor, Michigan. At all times relevant herein, Whirlpool was in the business of designing, manufacturing, marketing, selling, and/or distributing refrigeration products, including the defective French door refrigerators at issue, under various brand names, including KitchenAid, JennAir, Maytag, and Whirlpool.

---

[1] The * symbol denotes a wildcard for color and engineering version of the model, meaning that refrigerators with model numbers starting with the model number included before the * symbol are included as Class Refrigerators.

#### IV.     JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because there are least one-hundred class members, there is minimal diversity, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

8.      The Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper. Defendant intentionally avails itself of markets within California through its promotion, distribution, and sale of its products in this State.

9.      Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant transacts substantial business in the state of California, including in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

#### V.     FACTUAL ALLEGATIONS

10.      Refrigerators are an essential part of the modern American household, present in most American homes. They allow people to preserve their food and significantly decrease the risk of suffering food-borne disease.

11.      Today's refrigerators are much more sophisticated than their predecessors. For example, today, refrigerators and freezers are most often combined and sold together as a single refrigerator-freezer unit.

12.      One popular, modern refrigerator-freezer design is the French door refrigerator. French door refrigerators have one continuous refrigerator compartment on top that can be accessed by two doors, with a freezer drawer located below. This contemporary refrigerator design is known for its spacious refrigerator layout that provides easy access to the refrigerator compartment. Because of their spacious and stylish design and advanced features, French door refrigerators are generally more expensive than the average refrigerator-freezer unit. They can generally be expected to last between 10 and 15 years.

13.    At all times relevant herein, Defendant Whirlpool was in the business of designing, manufacturing, marketing, distributing, and/or selling home appliances and related products, including French door refrigerators, through various brand names, including Whirlpool, KitchenAid, JennAir, and Maytag, among others. At all relevant times herein, Whirlpool sold its French door refrigerators both through its authorized retailers and directly to consumers online through its respective brands' websites.

**A.    THE DEFECTIVE CLASS REFRIGERATORS**

14.    Whirlpool began designing, manufacturing, distributing, and/or selling the first of the Class Refrigerators around 2012. And, from the outset, Whirlpool's Class Refrigerators contained a fundamental and latent design flaw.

15.    Specifically, the Class Refrigerators contain a dual evaporator cooling system with a defrost heating system that is insufficient to properly defrost the evaporator in the Class Refrigerators' refrigeration compartment (the "RC Evaporator Defect"). As a result of the RC Evaporator Defect, frost and ice will periodically build up on the refrigeration compartment's evaporator, significantly impacting the refrigeration compartment's ability to cool food properly.

16.    The Class Refrigerators uniformly contain a dual evaporator cooling system, meaning that the refrigerator and freezer compartments each have their own, separate evaporator. The refrigeration compartment's evaporator is located in the back of Class Refrigerators' refrigeration compartment.

17.    Evaporators are responsible for making the interior of refrigerators and freezers cold by cooling the air within the unit. They function by absorbing and removing heat from the air and other items inside the refrigerator.

18.    As a matter of ordinary functioning of the evaporator, frost will sometimes form on the evaporator coil. However, excessive frost or ice build-up on the evaporator coil can restrict the flow of airflow through the evaporator, causing the refrigerator not to cool properly.

19.     The accumulation of frost and ice on a refrigerator's evaporator adversely affects cooling performance. When the evaporator coils frost or freeze over, air cannot easily pass through and get cold. The layer of frost deposited on an evaporator coil restricts the flow of air passing over that coil. This also reduces heat transfer between the air and the evaporator coil.

20.     To prevent frost and ice from accumulating on the evaporator, most refrigerators employ automatic defrosting systems that reduce the frost build-up on the refrigerator evaporator. These automatic defrosting systems typically employ defrost heaters to melt accumulated frost and ice off the evaporator coil surfaces and prevent the frost and ice from causing cooling issues. The defrost heater is normally situated alongside the evaporator coils and works by heating up and melting any ice build-up around the coils. The defrost heater automatically cycles to melt the ice and frost on the evaporator and keep the refrigerator cooling properly.

21.     The Class Refrigerators do not have a defrost heater that accompanies the evaporator in their refrigeration compartment. The lack of a defrost heater leads to the periodic accumulation of frost and ice on the refrigerator compartment's evaporator, causing the refrigerator to not cool properly.

22.     As a result of the RC Evaporator Defect, the Class Refrigerators periodically fail to perform their basic cooling function. This is because accumulated frost and ice on the refrigerator compartment's evaporator coil acts as an insulator by preventing air from contacting the evaporator coils and getting cold, resulting in the warming of the refrigerator compartment.

23.     Excessive frost and ice build-up on the refrigerator compartment's evaporator is annoying and potentially dangerous for consumers. Consumers cannot always immediately tell that their refrigerator is not cooling properly, leading the consumer to possibly unknowingly consume spoiled food. Thus, the RC Evaporator Defect poses a safety risk to consumers.

24.     Additionally, because of the RC Evaporator Defect, consumers will periodically have to manually defrost their refrigeration compartment, depriving them of the ability to use their

refrigerators and forcing them to throw away food and expend significant time and resources addressing the problem.

25.     The RC Evaporator Defect is material because it impacts the ability of the Class Refrigerators to cool food.

26.     The RC Evaporator Defect typically manifests during the expected useful life of the Class Refrigerators, both within and outside of applicable warranty periods, and is substantially likely to prevent the Refrigerators from consistently performing their essential function throughout their expected useful life.

27.     The RC Evaporator Defect is a uniform, latent defect in the Class Refrigerators that causes insufficient cooling in the product's refrigerator compartment. The defect is latent in that it is hidden deep within the Class Refrigerators' components, out of sight, and inaccessible to ordinary consumers without disassembling the refrigerator.

**B.     WHIRLPOOL'S KNOWLEDGE AND CONCEALMENT OF THE DEFECT**

28.     Whirlpool has long been aware of the presence of the RC Evaporator Defect in the Class Refrigerators through sources not available to ordinary consumers, such as internal testing, consumer complaints, warranty claims data, and other internal sources and aggregated information about the RC Evaporator Defect.

29.     Numerous consumer complaints about frost and ice build-up on the evaporator of the Class Refrigerators' refrigeration compartment were communicated to Defendant prior to the Plaintiffs' and the Class members' purchases of the Class Refrigerators.

30.     Whirlpool and its authorized service providers began receiving complaints about the RC Evaporator Defect in the Class Refrigerators as early as 2013. Numerous complaints on various websites indicate that customers repeatedly called Whirlpool's service lines and Whirlpool's authorized service providers to complain about the RC Evaporator Defect. For example, below are some examples of customer complaints on the website www.consumeraffairs.com:

★ ☆ ☆ ☆ ☆

**Nancy of Fanwood, NJ**

Original review: Sept. 8, 2013

Kitchen Aid Fridge model KF1S29BBMS00 (French Door w/ lower drawer freezer) - We bought our fridge in late June of 2013. It's now Early September and we've been without a properly functioning appliance for more than 2 weeks. Looking through the reviews, the prospect is daunting of waiting months to get this resolved.

Same issue as many. After a call to Kitchen Aid, a technician came to evaluate the issue and determined that it was an evaporator fan malfunction. It took 5 days to get the new part. A new technician/refrigeration "expert" came to install the new (and faulty) fan (The freezer door, which was functioning fine up to this point, was somehow damaged by him so that now it makes a noise when I open it). He said to give the fan 24 hours to cool the machine.

A day later it was no better than it was before, with the temperature hovering around 60 degrees. A new technician was sent out the next day. He determined, after taking the refrigerator apart that the new evaporator fan was faulty. He defrosted the evaporator with a heat gun and talked to Rick at the KitchenAid tech line (On an aside, the drawer display doesn't work at all, a whole different issue). Now we're waiting a week to get a new fan and no guarantee that this fan will work. We are very frustrated.

View less ⌃

👍 **Helpful**  │  **7 people** found this review helpful



**Brenda of Thornton, CO**     ✔ Verified Reviewer   $ Verified Buyer

Original review: July 13, 2015

French Door Refrigerator with Single Ice Maker KFIS29BBMS00 - We remodeled our kitchen in early 2013 and we bought higher end appliances, all KitchenAid brand. We paid over $2500 for this refrigerator. Since then the repair guy has had to come out to fix it 4 times. He will be here for the 5th time on Thursday. The issues have included ice build up at the back of the fridge, freezing our refrigerated products, not maintaining cold enough temp for our frozen products, ice maker not working well, ice bucket rusting out because the ice keeps melting and running down the front of the unit. The condenser was replaced and I don't know what else exactly, but each time they come to fix something, another problem surfaces.

The repair guy told me that this unit is a terrible one and they are constantly doing repairs on them. I called KitchenAid to see if they will do anything to try to remedy the situation and they said that there is nothing wrong with this unit and they have no record of issues with the model. So basically, we spent $2500 for a lemon and will have to replace it on our own dime. I would totally participate in a class action lawsuit against them! This is unethical!

View less ∧

👍 **Helpful** │ **29 people** found this review helpful





**Jan of Woodward, IA**     ✔ Verified Reviewer

Original review: Jan. 9, 2015

I purchased the KFIS29BBMS French Door Bottom Freezer refrigerator in 12/13. On November 1, 2014 the refrigerator quit cooling and the freezer quit. Of course, we lost food. The dealership brought us a loaner refrigerator because it took several weeks for the part to be delivered. It was "repaired" on Dec. 12, 2014. On Christmas Day 2014 while we were gone, it quit working again. Again we lost food. It was picked up to be repaired by the dealership on 12/26/14. The old loaner fridge was brought back and I haven't seen my refrigerator since. I have called Whirlpool corporation and have been given the standard warranty speech that they will repair it. I have asked for a new refrigerator to replace mine since it was less than 1 year old and obviously defective. Supervisor Chris was not helpful and said I shouldn't have bought the refrigerator if I didn't like the warranty. So count me in if a class action suit is started. I suggest we now go to social media and tell the stories.

👍 **Helpful** │ **28 people** found this review helpful

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

★ ☆ ☆ ☆ ☆

 **Suzanne of Dacula, GA**    ✔ Verified Reviewer

Original review: July 20, 2015

Our Kitchen Aid Model KFIS29PBMS00 is about 16 months old. We purchased a higher end appliance thinking it would last. It is the loudest (grinding noises) refrigerator I have ever had/heard, but we have dealt with that. When the unit recently stopped cooling we found it was under warranty. When the service technician saw which model it was, he said "I knew what the problem would be. It needs a new compressor and evaporation unit."

Unfortunately, the fastest it can be repaired is 5 days. Having children and no refrigerator is quite a problem when it comes to eating. Everything in the unit is a total loss. And despite being under warranty, there is nothing Kitchen Aid does to help you during this time with no way to cool food. No loaner and they won't just replace this faulty unit. This is really not customer service. Do not buy this model and if you can help it, do not purchase from KitchenAid because if you have a problem, despite a warranty, it will be a loss.

**View less ︿**

👍 **Helpful** │ **8 people** found this review helpful

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



 **Connie of Shoreline, WA**    ✔ Verified Reviewer

Original review: Dec. 8, 2015

I purchased a KitchenAid Refrigerator in 2013, stainless steel model #KFIS29BBMSOO. I've had numerous problems with it, many service calls. The first was the hose in the freezer splitting, which took 5 service calls to figure out, costing me for each one. Finally they said it was a recall item and I should not have had to pay. It was difficult to get my money back from the service people, took months.

Now there is ice building up behind the drawers in the refrigerator, blocking the vent. There is about 2" of ice built up so the drawers do not close completely. Everything in the drawers freezes. When I called repair people suggested by Whirlpool. As soon as they heard the model number they refused to come. I called Whirlpool again, they said they have never heard of any problems like this, however, when I read all of the reviews listed here there are a lot of problems with these refrigerators. The repair guys said KitchenAid is one of the worst brands now, made so poorly, but so expensive.

They finally found me a repairman, he is about 5 hours away, I told them he is not close, they said he probably knows someone closer to me, however the call is from 8:00-5:00, I have to wait. This has been so frustrating. I purchased 7 appliances at the same time, I did a remodel on my kitchen. My dishwasher failed after one year, the motor actually fell on the floor, it slow leaked onto my wood floors doing $40,000. damage, cabinets had to be pulled out walls repaired, took 5 months. KitchenAid would do nothing. The motor was not installed right at the factory, they tried to blame it on the installers. I'm fed up with KitchenAid, would never recommend it to anyone. I just can't believe they don't worry about their reputation.

**View less** ∧

★ ☆ ☆ ☆ ☆

 **BARBARA of Reston, VA**  ✔ Verified Reviewer

Original review: Feb. 29, 2016

We are on our 2nd KA French door, bottom freezer refrigerator (KFIS29BBWH). It was delivered 3/2013 as a replacement for a LEMON of the same design (KFIS27CXWH) that was purchased 10/2010. Thankfully, we purchased 5 year warranties for each one. Between the two refrigerators, we've had over 25 tech visits. Both units had complete failure of the evaporators and fans, more than once! Lost a lot of food, but the warranty company paid us $200 to cover (we submitted only twice, should have done it with each malfunction). Multiple other internal parts failed, including a cracked 2" plastic tube that runs from the water line to the ice maker. Each time a new part was installed, I looked for its place of manufacture. No surprise... Never from the USA (Mexico, South Korea, China).

From researching all brands of this new dual evaporator/French door bottom freezer, it is clear that these units are not fit to be on the US market. Faulty design? Faulty technology? Many say they are made in America, but most of the internal parts are made outside of this country and are installed in American factories. Recommendation: Don't purchase these types of refrigerators. Yes, they have a nice, updated look, but history shows they are nothing but a headache to the consumer. I'm returning to the old style, side by side with just one evaporator. So what that it isn't as "energy efficient". I've lost SO much time and energy dealing with this nonsense since 2010, and I'm done with it. Remember, Whirlpool Corp makes KA, Jenn-Air, Maytag, and Amana among others. Avoid these brands as well.

**View less ∧**



**Bill of Sherwood Park, AB**    ✔ Verified Reviewer

Original review: July 18, 2016

Salesman at my local appliance store said KitchenAid refrigerators are among the best. Great, paid $4000.00 for a model KRFF507ESS01. Beautiful fridge but, in just over a month it got really warm and we lost most of the food. Their warranty does not cover food spoilage. Service man comes, it's the motherboard, of course. It's faulty and they know it. Not too impressed, you would think that in 2016 they could build a fridge that works.

Updated om 10/14/2016: Fridge was good for the next two months and it died again. Another service call and the repair man said they do not have a fix at the moment. After a big fight the appliance store gave me another fridge. The fridge lost cooling because the evaporator behind the meat drawer would ice up and cold air could not pass up into the main compartment.

View less ∧

👍 **Helpful** | **17 people** found this review helpful




**Don of Hilton Head, SC**    ✔ Verified Reviewer

Original review: Aug. 19, 2016

Model KFIS29PBMS French Door Bottom Mount bought July 2013. Have had repeated problems for 3 years. Serviceman comes almost on monthly call. Nearly ALL parts have been replaced. KitchenAid refuses to own up to a bad product although I have found numerous reports online of perpetual problems with this model. KitchenAid (Whirlpool) says its warranty for one year only -- that's about all this product is good for. Serviceman replaced parts 3 times in last 2 months. He was here yesterday and I will be calling for his return again ASAP. Refrigerator ices up, leaks, fails to keep food cool, etc. etc. etc.

👍 **Helpful** | **12 people** found this review helpful

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



★ ☆ ☆ ☆ ☆

**Tom of Trabuco Canyon, CA**   ✔ Verified Reviewer

Original review: Aug. 27, 2017

KitchenAid refrigerator model #KRFF507ESS01 defrost problems - Since purchasing the refrigerator I have had to have it defrosted four times. Every three to four months the fridge gets warm and the coils, fan and other components in the fridge get completely covered in a block of ice. Two service calls were made while the fridge was under warranty. The technician that came replaced a thermostat, but also said that he didn't feel it would fix the problem and that it would happen again. In fact, it has happened twice since. KitchenAid refuses to do anything about this. My background is in engineering and product development and I must say that the design of this fridge is suspect. The use of a very low quality fan, no defrosting heater and some very cheap packing Styrofoam as part of the air routing system is very suspect in my opinion. It does not appear to be properly engineered.

**Read full review ⌄**



👍 **Helpful**  |  **21 people** found this review helpful

★ ☆ ☆ ☆ ☆



**Jim of Fort Worth, TX**   ✔ Verified Reviewer

Original review: Sept. 4, 2018

In September of 2016 we purchased a very expensive KitchenAid fridge, almost $3,000. It was supposed to be the top of the line. Thank goodness we bought the extended warranty, because as I write this I am waiting for the repairman to come out for the FOURTH time. This will be the third time that ice has built up along the inside of the back wall, and to fix it requires the unit to be shut off, drawers and shelves removed, and the ice to melt away so he can open up the back and do his thing. The ice build up impacts the fan, creating a loud noise, and inhibits the ability of the unit to make ice. The other service call was for a malfunctioning deli tray control. Prior to this unit, for 14 years I had a Bosch unit in my other home which worked flawlessly. I would never buy another KitchenAid fridge again.

👍 **Helpful**  |  **21 people** found this review helpful

1
2
3
4
5
6
7
8
9
10
11



**Mira of Windermere, FL**    ✔ Verified Reviewer

Original review: Aug. 24, 2018

We purchased a dishwasher, microwave, oven and refrigerator from KitchenAid about a year ago and are currently having the refrigerator repaired for the 3rd time for the SAME issue! The fan in the refrigerator (KRFF707ESS01) doesnt work properly which allows ice to form in the back. This means that the drawers dont close anymore and the fan is very loud since it is hitting the ice. KitchenAid customer service has been absolutely useless. Im very disappointed in the product quality and the company and will never purchase a KitchenAid product or any Whirlpool product ever again!

👍 **Helpful**  |  **25 people** found this review helpful

12
13
14
15
16
17
18
19
20




**Robert of Tucson, AZ**    ✔ Verified Reviewer

Original review: Sept. 27, 2018

Bought a KitchenAid model KFIS29PBMS03 in August 2015, it stopped cooling and making ice in July 2017. It turns out that it can't defrost itself. After in excess of ten service calls (through and paid for by KitchenAid) they declared it unrepairable 14 months later. The Tech Line said it couldn't be repaired and that I should contact "Customer Care". They contacted me two days later and said they wouldn't replace it because it was no longer under warranty! Stay away from anything that's says Whirlpool or KitchenAid on it. Junk!

👍 **Helpful**  |  **19 people** found this review helpful

21
22
23
24
25
26
27
28



★ ☆ ☆ ☆ ☆

**L. of Port Richey, FL**     ✔ Verified Reviewer

Original review: April 8, 2019

This refrigerator is just over 1 year old and it has stopped cooling 5 times. It is a defect that KitchenAid is aware of and they aren't doing anything to fix it. They have an internal service bulletin on this issue. They send a repairman out and he replaces a part and 2 months later it stops cooling due to ice build up behind cold cut/vegetable drawer. They continue to make different repairs until your warranty is expired, then you are out of luck. KitchenAid knows they have a bad product. They don't have a permanent solution, yet they continue to sell this model. What kind of company does this? How do they get away with it? AN ATTORNEY NEEDS TO FILE A CLASS ACTION LAWSUIT! Maybe that will get KitchenAid's attention.

👍 Helpful   |   **33 people** found this review helpful

★ ☆ ☆ ☆ ☆

 **Patricia of Audubon, NJ**     ✔ Verified Reviewer

Original review: Aug. 10, 2019

So disappointed in my 6 yo KitchenAid French door refrigerator model # KFIS29PBMS00. Ice accumulates in the back which impacts the refrigerator's ability to stay cold. It's 53 degrees now!! We have had it repaired at least once a year for every year we have owned it. We always renewed our extended warranty plan because it was cheaper than paying out of pocket for the repairs. Our factory certified repairman told us it was a defect in manufacturing! Well we are done with this refrigerator!

👍 Helpful   |   **5 people** found this review helpful

31.     The above posts are just a few examples of consumers complaining to Whirlpool and its authorized service providers regarding the Class Refrigerators and the RC Evaporator Defect. Although the above posts largely deal with KitchenAid refrigerators, there are numerous complaints on various websites demonstrating consumers notifying Whirlpool and its authorized service providers about the RC Evaporator Defect in various brands of Class Refrigerators.[2] These evidence consumers'

---

[2] *See, e.g.,* https://www.consumeraffairs.com/homeowners/whirlpool_refrigerators.html?#reviews.

repeated calls to Whirlpool and its authorized service providers regarding the RC Evaporator Defect in the Class Refrigerators and Whirlpool's inability to repair the problems.

32.     Upon information and belief, consumers have also complained about the Class Refrigerators and the RC Evaporator Defect on Whirlpool's websites, giving Whirlpool direct knowledge of the problem.

33.     Upon information and belief, Whirlpool also became aware of the RC Evaporator Defect through its internal product monitoring process, including its collection of warranty claims data. As the above-referenced complaints indicate, from 2013 to the present, many consumers contacted Whirlpool and its authorized service repair providers regarding the RC Evaporator Defect in the Class Refrigerators.

34.     Whirlpool has admitted in other litigation that it "regularly monitors the performance of its products in the field and evaluates its warranty claims data to identify opportunities to improve its products." *See* Dkt. 122 at 2, *Corzine v. Whirlpool Corp.*, No. 15-CV-05764-BLF (N.D. Cal.).

35.     Upon information and belief, Whirlpool has an ordinary process of tracking and receiving information from its customer service line, warranty service providers, and complaints posted on websites by consumers.

36.     Upon information and belief, warranty service providers used by Defendant report the types of problems encountered and obtain the necessary equipment, instruction, and training to repair Defendant's products. Accordingly, when complaints about the RC Evaporator Defect were made and when authorized warranty service providers attempted to repair problems associated with the RC Evaporator Defect, Defendant would receive and internally track that information.

37.     Whirlpool's knowledge of the RC Evaporator Defect in the Class Refrigerators is most readily demonstrated by the fact that Whirlpool attempted to develop a "fix" for the problem and issued numerous technical service pointers ("TSP") to its authorized service providers regarding the RC Evaporator Defect.

No.                                                    16                                          COMPLAINT

38.     In March 2017, Whirlpool issued a mandatory TSP (Technical Service Pointer #W11092686A) regarding the RC Evaporator Defect to its authorized service providers. *See* Ex. A. This TSP informed Whirlpool's authorized service providers that "[i]t is possible that consumers may experience frost, or hard ice, forming on the front area of the Refrigeration Compartment" of the Class Refrigerators. The TSP advised Whirlpool's authorized service providers that the problem could have "various different causes each requiring a unique correction," identifying several causes, including the defrost system, as a potential cause for ice build-up on the evaporator. The TSP then offered several different methods that service providers could employ to try and fix the problem.

39.     Then, in January 2019, Whirlpool issued another mandatory TSP (Technical Service Pointer #W11092686D) regarding the RC Evaporator Defect to its authorized service providers. *See* Ex. B. This TSP informed Whirlpool's authorized service providers that "[i]t is possible that consumers may experience frost, or hard ice, forming on the front area of the Refrigeration Compartment" of the Class Refrigerators. The TSP advised Whirlpool's authorized service providers that the problem could have "various different causes each requiring a unique correction," identifying several causes, including the defrost system as a potential cause for ice build-up on the evaporator. The TSP then offered several different methods that service providers could employ to try and fix the problem. These were the same recommended methods as provided in the 2017 TSP on the issue.

40.     Finally, in March 2021, Whirlpool released another mandatory TSP (Technical Service Pointer #W11092686 Rev. G) regarding the RC Evaporator Defect to its authorized service providers. *See* Ex. C. This TSP informed Whirlpool's authorized service providers that "[i]t is possible that consumers may experience frost, or hard ice, forming on the front area of the Refrigeration Compartment" of the Class Refrigerators, as well as other problems. The TSP advised Whirlpool's authorized service providers that the problems could have "multiple potential causes and corrections," identifying several causes, including the defrost system as a potential cause for ice build-up on the refrigeration compartment's evaporator. The TSP then offered several different methods that service

providers could employ to try and fix the problems, including increasing the number of defrost cycles for the freezer compartment's automatic defrost heater.

41.    Thus, as early as 2017, Defendant was sufficiently aware of the RC Evaporator Defect to study, investigate, and engineer some proposed solutions to the cooling problems caused by the RC Evaporator Defect.

42.    Although Defendant began issuing TSPs about the RC Evaporator Defect in 2017, these technical service pointers were only issued to Defendant's authorized repair service providers and not to ordinary consumers like Plaintiffs.

43.    The repair methods Defendant developed and identified in the TSPs regarding the RC Evaporator Defect in the Class Refrigerators are only temporary fixes to the problem. Because of the nature of the RC Evaporator Defect, even after Defendant's proposed methods have been employed, the evaporator in the Class Refrigerator's refrigeration compartment will continue to periodically accumulate frost and ice, causing cooling issues. The build-up of ice and frost on the evaporator can occur months apart, leading consumers to believe that Defendant's temporary fixes had addressed the issue, when in fact the RC Evaporator would continue to cause frost build-up and cooling issues throughout the useful life of the Class Refrigerators.

44.    At all relevant times herein, Defendant knew that the temporary solutions it offered as fixes for the RC Evaporator Defect in its TSPs would not permanently prevent the build-up of frost and ice on the evaporators in the Class Refrigerator's refrigeration compartments.

45.    To date, Whirlpool has not implemented an effective remedy for those who suffer the RC Evaporator Defect. Instead, Defendant continues to advise affected consumers to repair or replace various parts in the Class Refrigerators, knowing full well that its proposed methods of correction will not permanently address the frost and ice build-up and cooling issues caused by the RC Evaporator Defect.

46.     At all relevant times herein, knowledge of the RC Evaporator Defect was unknown to Plaintiffs, who were not on the receiving end of consumer complaints or Defendant's TSPs and were not privy to Defendant's internal testing and warranty claims tracking data. Furthermore, at all relevant times herein, information about the RC Evaporator Defect was largely hidden from consumers.

47.     Despite having superior knowledge of the material RC Evaporator Defect and the safety issues it presents, at no point has Defendant disclosed the existence or nature of the RC Evaporator Defect to consumers, even when Defendant has had multiple opportunities to do so, including disclosure at the retail display or in the product marketing of the Class Refrigerators, disclosure on Defendant's various websites, or disclosure at the point of purchase.

48.     Instead of disclosing the RC Evaporator Defect to consumers, at all relevant times herein, Defendant continued to promote the use of the dual evaporator system in the Class Refrigerators in product marketing and materials. For example, on its website, Defendant represents that the Class Refrigerators' "[a]dvanced dual cooling technology senses conditions and automatically adapts humidity levels, so food is stored in the right environment."[3] And in the manuals for the Class Refrigerators, Whirlpool states that "[y]our French Door Refrigerator comes equipped with innovative storage and energy efficient features."[4] Regarding the dual evaporator system, manuals for the Class Refrigerators state:

> The refrigerator and freezer compartments have dedicated evaporators to provide fresh and frozen foods with separate climates. Frozen food stays cold and dry, while fresh food remains at the ideal temperature and humidity.[5]

---

[3] *See, e.g.,* https://www.whirlpool.com/kitchen/refrigeration/refrigerators/french-door/p.36-inch-wide-4-door-refrigerator-with-exterior-drawer-26-cu.-ft.wrx986sihz.html?.

[4] *See, e.g.,* https://www.whirlpool.com/content/dam/global/documents/201612/userguide-w10859967-reva-eco.pdf.

[5] *See id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.    FACTUAL ALLEGATIONS RELATING TO PLAINTIFFS**

49.    On or around December 21, 2018, Plaintiffs Nancy Paperno and Robert Gibbany purchased a KitchenAid French door refrigerator (Model Number KRFF707ESS) (Serial Number K84921449) for $3,494.12 from the Best Buy located at or near 4280 Dublin Blvd., Dublin, California, 94568.

50.    Unbeknownst to Plaintiffs, at the time they purchased the French door refrigerator, the refrigerator contained the hidden RC Evaporator Defect.

51.    At all times relevant herein, Plaintiffs used the French door refrigerator as the household refrigerator for their family.

52.    In approximately October 2020, Plaintiffs noticed their French door refrigerator was not cooling properly and that food items, such as milk, were starting to go bad before their expiration date or experiencing mold growth. Over time, Plaintiffs observed the cooling problems gradually getting worse.

53.    On or around October 17, 2020, Plaintiffs contacted KitchenAid's online service department to set up an appointment to have their refrigerator repaired. Plaintiffs emptied all items from their refrigerator and moved them to the refrigerator in their garage.

54.    On or around October 21, 2020, KitchenAid's authorized service provider came out and replaced the compressor and evaporator in the refrigeration compartment of Plaintiffs' French door refrigerator. Plaintiffs were not charged for this repair service.

55.    However, in approximately April 2021, Plaintiffs again experienced the same cooling problems with their French door refrigerator. Plaintiffs noticed that food items in the refrigeration compartment, such as milk and fruit, would experience mold growth or go bad before their expiration date.

56.    On or around April 7, 2021, Plaintiffs called KitchenAid's service department to set up a service appointment. The soonest an authorized service provider could come to look at Plaintiffs'

refrigerator was April 22, 2021. Once again, Plaintiffs had to move all of their food items to their garage refrigerator until their French door refrigerator could be fixed.

57.     On or around April 22, 2021, KitchenAid's authorized service provider came to assess and fix the cooling issues in the refrigeration compartment of Plaintiffs' French door refrigerator. The service provider defrosted the evaporator in the refrigeration compartment and replaced the harness. For this service, Plaintiffs paid $216.85 for labor and $65.55 for parts.

58.     In approximately October 2021, Plaintiffs began to once again experience cooling issues in the refrigeration compartment of their French door refrigerator.

59.     On or around October 7, 2021, Plaintiffs again contacted KitchenAid's service department about their cooling issues. Plaintiffs' refrigerator could not be serviced until October 14, 2021. Plaintiffs again had to move all of their food items to their garage refrigerator until their French door refrigerator could be fixed.

60.     On or around October 14, 2021, KitchenAid's authorized service provider assessed and attempted to fix the cooling issues with Plaintiffs' French door refrigerator. The service provider needed to order parts which could not be delivered for four to six weeks. Plaintiffs could not use the refrigeration department of their French door refrigerator to keep food cold during this time period.

61.     On or around December 9, 2021, after the ordered parts arrived, KitchenAid's authorized service provider replaced the refrigerator's control board and defrosted the refrigerator's evaporator. Plaintiffs paid $383.81 for this service.

62.     In approximately May 2022, Plaintiffs again began to experience cooling issues in the refrigeration compartment of their French door refrigerator. The food items in their refrigerator, including milk, fruit, and bread, would experience mold growth or would go bad before their expiration date.

63.     On or around May 2, 2022, Plaintiffs again contacted KitchenAid's service department about their cooling issues.

64.     On or around May 3, 2022, KitchenAid's authorized service provider once again assessed and attempted to fix the cooling issues with Plaintiffs' French door refrigerator. The service provider again had to order parts to complete the repairs. Plaintiffs could not use the refrigeration compartment of their French door refrigerator to keep food cold during this time period.

65.     On or around May 12, 2022, KitchenAid's authorized service provider replaced the harness and three-way valve in the refrigerator. At this point, the authorized service provider expressed that Plaintiffs may need a new refrigerator.

66.     In approximately March 2023, Plaintiffs once again experienced cooling issues in the refrigeration compartment of their French door refrigerator. The food items in their refrigerator, including milk, fruit, and bread, experienced mold growth or went bad before their expiration date.

67.     On or around March 16, 2023, Plaintiffs called KitchenAid to inform them of the repeated cooling issues with their French door Refrigerator. Plaintiffs were told by a representative from KitchenAid that there was nothing that could be done to help them.

68.     On or around March 16, 2023, Plaintiffs called a service provider to schedule an appointment to have their refrigerator fixed again. Plaintiffs scheduled a service appointment for March 21, 2023. Plaintiffs could not use the refrigeration department of their French door refrigerator to properly keep food cold during this time period.

69.     On or around March 21, 2023, a service provider came out to assess Plaintiffs' French door refrigerator. The provider took pictures of Plaintiffs' refrigerator to share with co-workers in assessing the problem.

70.     The service provider ultimately determined that Plaintiffs' French door refrigerator had a problem with the defrost system for the evaporator in the refrigeration compartment. On or around March 22, 2023, the service provider provided Plaintiffs with a quote for replacing the refrigerator's fan motor assembly with defrost thermistor and temperature sensor and for drain line cleaning.

71.     On March 31, 2023, the service provider came out to fix Plaintiffs' French door refrigerator. The service provider took the unit apart and installed a new fresh food evaporator fan motor assembly. Plaintiffs paid $487.17 for parts and service. Plaintiffs also had to empty their refrigerator, and they were unable to put their food back into the refrigerator until the following day.

72.     In the summer of 2023, Plaintiffs again experienced cooling issues and freezing in the refrigeration compartment of their French door refrigerator.

73.     Had Plaintiffs known their Class Refrigerator had the RC Evaporator Defect that would cause their refrigerator to stop cooling properly and pose safety risks and financial burdens to Plaintiffs and their family members, Plaintiffs would not have purchased the Class Refrigerator or would have paid less for it.

## VI.     TOLLING OF THE STATUTE OF LIMITATIONS

74.     Any applicable statutes of limitation have been tolled by Defendant's continuing, knowing and active concealment of the facts alleged herein. Defendant has concealed material information from Plaintiffs and the Class that is essential to the pursuit of their claims, despite Plaintiffs' and the Class members' due diligence.

75.     Long before Plaintiffs and the putative Class Members purchased their Class Refrigerators, Defendant knew that the Class Refrigerators were defective and that Plaintiffs and the putative Class Members did not have that knowledge. Despite reasonable diligence on their part, Plaintiffs and the Class members were kept ignorant by Defendant of the factual bases for the claims for relief asserted below.

76.     Due to the technical nature of the defect, Plaintiffs did not discover and could not reasonably have discovered the RC Evaporator Defect on their own.

77.     Furthermore, by having Defendant's authorized service providers attempt to repair a problem that Defendant knew would continue, Plaintiffs were deceived into thinking that Defendant had corrected the issue, whereas, all along, Defendant knew that any repair of the RC Evaporator

Defect was only a temporary fix and that its proposed correction methods would not permanently solve the issues associated with the RC Evaporator Defect.

78.     At all times relevant herein, Defendant knew of the nature of the RC Evaporator Defect, the materiality of the defect, and the safety risks posed by it. Defendant's knowledge of the RC Evaporator Defect is demonstrated by the numerous technical service pointers ("TSP") Defendant issued regarding the defect, by Defendant's receipt of customer complaints, and by Defendant's tracking and monitoring of its warranty claims data, among others.

79.     By continuing to actively and knowingly sell the Class Refrigerators without disclosing the RC Evaporator Defect to consumers, Defendant concealed material information from Plaintiffs and the Class that is essential to the pursuit of their claims, despite Plaintiffs' and the Class members' due diligence.

80.     Defendant intentionally suppressed and concealed material facts about the performance and quality of the Class Refrigerators. As alleged herein, Defendant knew about the defective nature of the evaporator and related parts in the refrigeration compartment of the Class Refrigerators. Further, Defendant was aware of numerous consumer complaints concerning defect-related problems, but never disclosed the defect to Plaintiffs and the Class members.

81.     Because the defect in the Class Refrigerators is latent and unobservable until it arises, Plaintiffs and the Class members had no reasonable means of knowing Defendant had failed to disclose the defective nature of the Class Refrigerators. Plaintiffs and the Class members did not and reasonably could not have discovered Defendant's deceit before they purchased their Class Refrigerators.

82.     Defendant concealed the RC Evaporator Defect to sell more Class Refrigerators at a premium price, prevent damage to its brand, and avoid the costs of an effective fix and of repairs, replacements, and refunds for its customers.

83.    Defendant had a duty to disclose the RC Evaporator Defect because the defect is material and because Defendant possessed exclusive knowledge of the RC Evaporator Defect and the safety risks it posed to consumers.

84.    When deciding to purchase a Class Refrigerator, Plaintiffs and the Class members reasonably relied to their detriment upon Defendant's material misrepresentations and omissions regarding the quality of the Class Refrigerator and the absence of a product defect.

85.    Had Plaintiffs and the Class Members known that the Class Refrigerators are defective, they would not have purchased a Class Refrigerator or would have paid less for their Class Refrigerator.

## VII.    CLASS ALLEGATIONS

86.    Plaintiffs bring this action individually and as the representatives of the proposed Class, defined as follows:

> all persons who purchased, other than from resale, a Class Refrigerator within the State of California from Defendant or its authorized retailers.

87.    Plaintiffs' claims are typical of those of the Class. Plaintiffs and the Class members were damaged in the same way by the same conduct of the same Defendant.

88.    Plaintiffs will adequately protect and represent the interests of the proposed Class members. Plaintiffs' interests are aligned with, and not antagonistic to, those of the Class members.

89.    Plaintiffs are represented by attorneys who are experienced and competent in the prosecution of complex class action litigation.

90.    Questions of law and fact common to the Class include, but are not limited to, the following:

A.    Whether Defendant breached the implied warranty of merchantability;

B.    Whether the RC Evaporator Defect caused the Class Refrigerators to be unmerchantable;

C.    Whether Defendant had a duty to disclose the RC Evaporator Defect;

D.    Whether Defendant engaged in unfair, unlawful, or fraudulent acts; and

E.    Whether the RC Evaporator Defect was material.

91.    The above-identified common questions predominate over questions, if any, that may affect only individual Class members.

92.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

93.    Although the exact number of Class members is uncertain and can only be ascertained through appropriate discovery, the number of putative Class members is greater than one hundred (100) such that joinder is impracticable. Upon information and belief, Defendant has designed, manufactured, marketed, distributed, and sold many thousands of Class Refrigerators to California residents during the relevant time period.

94.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the necessary duplication of evidence, effort, and expense that numerous individual actions would require.

95.    A class action is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual members, and a class action is superior to any other available means for fairly and efficiently adjudicating the controversy.

## COUNT ONE — FIRST CAUSE OF ACTION

**Breach of Implied Warranty under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §1790 *et seq.***

96.    Plaintiffs and the putative Class hereby re-allege and incorporate by reference all previous paragraphs of this complaint as if fully set forth herein.

97.    Plaintiffs, individually and on behalf of all persons similarly situated seek recovery for Defendant's breach of the implied warranty of merchantability.

98.    Under California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code §1790 *et seq.*, every sale of consumer goods is accompanied by both a "manufacturer's and retailer's" implied warranty that the goods are merchantable, meaning that they are fit for the ordinary purpose for which such goods are used.

99.    The Class Refrigerators and the parts contained therein are "consumer goods" within the meaning of California Civil Code section 1791(a).

100.    Plaintiffs and the putative Class Members are and were at all relevant times buyers within the meaning of California Civil Code section 1791(b).

101.    Defendant is a "manufacturer" within the meaning of California Civil Code section 1791(j). At all times relevant herein, Defendant was in the business of manufacturing, distributing, and selling the refrigerators with the RC Evaporator Defect. Further, at all times relevant herein, Defendant was responsible for producing the Class Refrigerators, and directed and was involved in all stages of their production and manufacturing process.

102.    Plaintiffs purchased and the putative Class members purchased their Class Refrigerator from retail sellers in California.

103.    Defendant impliedly warranted to Plaintiffs and the Class members that the Class Refrigerators were "merchantable" under California Civil Code sections 1791.1(a) and 1792. Defendant further impliedly warranted that the Class Refrigerators were in a safe condition and substantially free of fundamental defects.

104.    By operation of law, at the time of sale, Defendant impliedly warranted to Plaintiffs and the Class members that the Class Refrigerators were of merchantable quality and fit for the ordinary purposes for which they are intended and used. However, as discussed herein, Defendant knowingly

breached the implied warranty of merchantability at the time of the sale of the Class Refrigerators because the Refrigerators contained the inherent and latent RC Evaporator Defect.

105.    Defendant's actions, as complained of herein, breached Defendant's implied warranties in violation of the Song-Beverly Act including, but not limited to, California Civil Code sections 1791.1 and 1791.2. The Class Refrigerators were delivered with serious, hidden defects that breached Defendant's implied warranties.

106.    Defendant impliedly warranted to Plaintiffs and the Class members that the Class Refrigerators were "merchantable" under California Civil Code sections 1791.1(a) and 1792. Defendant further impliedly warranted that the Refrigerators were in a safe condition and substantially free of fundamental defects.

107.    The implied warranty that consumer goods are in a merchantable condition means that the goods "conform to the promises or affirmations of fact made on the container or label." Cal. Civ. Code § 1791.1(a)(4).

108.    Among other ordinary uses, an ordinary purpose of a refrigerator is to consistently keep food cold. However, as a result of the RC Evaporator Defect, Defendant breached the implied warranty of merchantability because, at the time of sale, the Class Refrigerators contained a hidden and fundamental defect that causes the refrigeration compartment's evaporator coil to periodically freeze over, significantly impacting the ability of the refrigerator to keep food cold and safe for consumption and forcing consumers to expend time and resources to routinely defrost the refrigerator compartment so that they could ensure their food was safe to consume.

109.    Defendant breached the implied warranty of merchantability by producing, manufacturing, and selling unmerchantable goods. The Class Refrigerators are defective in that RC Evaporator Defect routinely manifests well before the end of the useful life of the Class Refrigerators. When the defect manifests such that defrosting is required, the result is a total failure—the refrigerator

is unable to fulfill its core function of cooling. The Class Refrigerators are thus unfit for the ordinary purposes for which a refrigerator is used and would not pass without objection in the refrigerator trade.

110. Defendant also breached the implied warranty of merchantability by manufacturing, distributing, and selling the Class Refrigerators with a defective evaporator and defrost heater design that resulted in repeated accumulation of frost and ice on the evaporator located in the refrigeration compartment.

111. The RC Evaporator Defect is latent. Although the Class Refrigerators appear to be operable when new, the defect existed within each Class Refrigerator at the time of sale and throughout the periods of the implied warranties. Accordingly, the discovery of the defect by a purchaser during or after a warranty period does not bar a Song-Beverly claim for breach of the statutory implied warranty.

112. As discussed herein, Defendant was fully aware of the RC Evaporator Defect within the Class Refrigerators, repeatedly disclosing the defect to Defendant's authorized service providers. Furthermore, Defendant was fully aware that Defendant's proposed remedies to the RC Evaporator Defect would only temporarily solve the problem and that the Class Refrigerators would continue to indefinitely suffer from the presence of frost and hardened ice in their refrigerator even after Defendant's suggested repairs were implemented. However, despite having superior knowledge of the Defect and its inability to be remedied, Defendant never disclosed the existence of the RC Evaporator Defect in the Class Refrigerators to Plaintiffs or the Class members.

113. Any attempt by Defendant to disclaim its implied warranty obligations under the Song-Beverly Act is ineffective due to its failure to adhere to California Civil Code sections 1792.3 and 1792.4. Those sections provide that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must "in simple and concise language" state: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire risk as to the quality and performance of the goods is with the buyer. (3) Should the goods prove defective following their purchase, the buyer and

not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair."

114.    Plaintiffs and the Class Members are excused from performance of any warranty obligations as a result of Defendant's intentional misconduct described herein, and any such obligations are unconscionable and therefore void as a matter of law.

115.    As a direct and proximate cause of Defendant's breaches of the Song-Beverly Act, Plaintiffs and the Class members have suffered economic damages in an amount to be proven at trial. Plaintiffs and the Class members are entitled to recover damages as provided by the Act, including, among other statutory damages, all amounts paid toward the purchase of the Class Refrigerators.

116.    Further, as discussed herein, Defendant knew of the RC Evaporator Defect before selling the Class Refrigerators. Thus, its Song-Beverly violations were willful. Accordingly, Plaintiffs and the putative Class seek a civil penalty of twice their actual damages. Plaintiffs and the putative Class also seek costs and expenses, including reasonable attorneys' fees, as provided under California Civil Code section 1794.

## COUNT TWO — SECOND CAUSE OF ACTION

### Breach of Implied Warranty under the California Commercial Code and California Common Law

117.    Plaintiffs and the putative Class hereby re-allege and incorporate by reference all previous paragraphs of this complaint as if fully set forth herein.

118.    The California Commercial Code implies a warranty of merchantability that goods are fit for ordinary purposes for which such goods are used. *See* Cal. Com. Code § 2314(2)(c).

119.    The Class Refrigerators are and were at all times relevant herein goods as defined by Cal. Comm. Code § 2105.

120.    Defendant is and was at all relevant times a merchant as defined by Cal. Comm. Code § 2104. At all relevant times herein, Defendant was in the business of manufacturing, distributing, and selling refrigerators, including the Class Refrigerators with RC Evaporator Defect.

121.    Plaintiffs and the Class members bought the Class Refrigerators with the Evaporator Defect in the State of California from Defendant's authorized sellers or third party beneficiaries of contracts with authorized sellers or directly from Defendant in the State of California. By purchasing through authorized retailers, Plaintiffs and putative Class Members were third-party beneficiaries of Defendant's contracts with its authorized sellers.

122.    Through its implied warranty, Defendant warranted to Plaintiffs and the Class that the Class Refrigerators they purchased were free from defects, of merchantable quality, and fit for the ordinary purposes for which a refrigerator is used.

123.    As discussed herein, Defendant breached its implied warranties by providing refrigerators with the inherent, latent, and fundamental RC Evaporator Defect. As a result of the inherent presence of the RC Evaporator Defect within the Class Refrigerators, the Class Refrigerators are unmerchantable and fail to perform in accordance with their ordinary and intended purposes, including, among others, continuously keeping food cold.

124.    There is privity between Defendant, Plaintiffs, and the Class because Plaintiffs and the Class members were intended third-party beneficiaries of the implied warranty made by Defendant. Defendant knew that the retailers to whom it sold the Class Refrigerators were not going to own the refrigerators any longer than it took to sell them to Plaintiffs and the putative Class. Further, Defendant intended that the implied warranty that applied to the refrigerators was for the benefit of the Plaintiffs and the Class. Additionally, Defendant affirmatively provided their authorized service providers with information regarding responding to warranty claims relating to the RC Evaporator Defect according to Defendant's warranties.

125.    Defendant has been given reasonable notice of the RC Evaporator Defect and sufficient opportunities to cure its breaches of warranty. As discussed herein, Defendant had actual knowledge and ample notice that the Class Refrigerators contain the RC Evaporator Defect, but failed to provide an adequate or lasting remedy even after issuing numerous technical service pointers ("TSP") regarding the issue. Any further notice provided would have been duplicative and/or futile.

126.    Defendant cannot disclaim the implied warranty of merchantability.

127.    As a direct and proximate result of Defendant's breaches of its implied warranty of merchantability, Plaintiffs and the Class members have suffered damages in an amount to be determined at trial.

### COUNT THREE — THIRD CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq. (the "CLRA")

128.    Plaintiffs and the putative Class hereby re-allege and incorporate by reference all previous paragraphs of this complaint as if fully set forth herein.

129.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." The prohibited unfair or deceptive acts or practices include, among others: (a) "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," *id*. § 1770(a)(5); and (b) "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," *id*. § 1770(a)(7).

130.    The CLRA applies to Defendant's actions and conduct described herein because it extends to transactions that are intended to result, or which have resulted, in the sale of goods to consumers for personal, family, or household use.

131.    The Class Refrigerators are "goods" within the meaning of California Civil Code section 1761(a).

132.    Defendant is a "person" within the meaning of California Civil Code section 1761(c).

133.    Plaintiffs and Class members are "consumers" as defined in California Civil Code section 1761(d).

134.    Defendant's conduct as alleged herein constitutes "transactions" within the meaning of California Civil Code section 1761(e).

135.    As alleged herein, Defendant's conduct violates California Civil Code sections 1770(a)(5), (7), and (9) because Defendant has performed numerous unfair and deceptive acts and practices—including fraudulent omissions—in connection with the marketing and sale of the Class Refrigerators. In violation of the CLRA, Defendant:

A.    Represented that the Class Refrigerators had characteristics, uses, and benefits they do not have;

B.    Represented that the Class Refrigerators are of a certain standard, quality, or grade when in fact they are not; and

C.    Advertised the Class Refrigerators, including their component parts, with intent to not sell them as advertised.

136.    At all times relevant herein, Defendant knew that the Class Refrigerators were defective and prone to the periodic formation of frost and ice on the refrigerator compartment's evaporator coil, causing the product to fail and requiring the consumer to defrost the refrigerator. As discussed herein, Defendant acquired such knowledge from multiple sources, including, without limitation, its own design, development, and testing of the Class Refrigerator's evaporator coils and defrost heater systems, its own monitoring of warranty claims and product performance, consumer complaints that it received, and its interactions with its authorized service providers, among others.

137.    Defendant's actual knowledge of the RC Evaporator Defect is also demonstrated by their issuance of numerous multiple technical service pointers ("TSP") regarding the Defect to their authorized service providers and the fact that Defendant had developed a "fix" for when the Class Refrigerators' evaporator coil froze over.

138.    Defendant owed Plaintiffs and the Class members a duty to disclose the existence of the RC Evaporator Defect in the Class Refrigerators because the defect was hidden and technical and because Defendant had superior knowledge of the existence and nature of the defect.

139.    Defendant further owed Plaintiffs and the Class members a duty to disclose the existence of the RC Evaporator Defect in the Class Refrigerators because the defect posed a safety risk to consumers in that it periodically caused the Class Refrigerators to stop keeping food cold, leading the food within the refrigerators to spoil and become unsafe for consumption without consumers' knowledge.

140.    Defendant had multiple opportunities to disclose the existence and nature of the RC Evaporator Defect and the extraordinary measures consumers would have to take to address the issues caused by periodically having a frozen evaporator coil in the refrigeration compartment. These opportunities include, but are not limited to, disclosure at the retail display or in the product materials for the Class Refrigerators, on its various brands' websites, and at the point of purchase.

141.    Nevertheless, despite its exclusive knowledge of the RC Evaporator Defect and its numerous opportunities to disclose the Class Refrigerators' defective nature, Defendant failed to disclose the RC Evaporator Defect to Plaintiffs and the Class members prior to purchase.

142.    Defendant purposefully withheld information regarding the RC Evaporator Defect in a calculated attempt to run out the clock on its obligations under Defendant's one-year limited warranty. As evidenced by Defendant's technical service pointers, Defendant knew the Class Refrigerators were defective during the warranty period and did not inform consumers of the defect, leaving consumers to fend for themselves in diagnosing, remedying, and repairing the problem. Moreover, Defendant also

failed to disclose that even if repairs were performed relating to the RC Evaporator Defect occurred during the first year after purchase, such repairs would only temporarily solve the issue and that the nature of the RC Evaporator Defect would cause the evaporator coils in the refrigerator compartments of the Class Refrigerators to continue to freeze over in the future regardless of the repairs.

143.    Defendant's misrepresentations and fraudulent omissions regarding the Class Refrigerators were material because had Plaintiffs and the putative Class members known that the Class Refrigerators contained the RC Evaporator Defect they would not have purchased the Class Refrigerators or would have paid less for them.

144.    Further, the facts concealed and omitted by Defendant to Plaintiffs and Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Refrigerators or pay a lower price.

145.    As a direct and proximate cause of Defendant's fraudulent and deceptive business practices, Plaintiffs and the Class members suffered damages in amount to be determined at trial. Therefore, Plaintiffs and Class members are entitled to equitable and monetary relief under the CLRA.

146.    As a direct and proximate cause of Defendant's conduct, Plaintiffs and the Class have suffered and continue to suffer injury in fact and have lost money as a result of Defendant's omission in that they would not have purchased or paid as much for the Class Refrigerators had they known the existence of the RC Evaporator Defect within the Class Refrigerators and that the defective nature of the refrigerators would cause the refrigerators to repeatedly fail in their essential function of refrigeration and storing food and cause them to repeatedly, over the course of the refrigerators' useful life, spend time and resources defrosting the refrigeration compartment or calling someone to address the problem.

147.    Defendant's actions were intended to harm Plaintiffs and the Class and were done with malice and conscious disregarding of Plaintiffs and the Class members' rights as stated herein.

148.    On behalf of themselves and the Class, Plaintiffs request an order enjoining Defendant's relevant methods, acts, or practices, and any other relief that the Court deems proper.

149.    Furthermore, pursuant to California Civil Code section 1782(a), Plaintiffs, individually and on behalf of the Class, sent CLRA notices to Defendant on May 16, 2023 and June 7, 2023 via certified mail, return receipt requested, to Defendant's principal place of business and registered agent, advising Defendant that it is in violation of the CLRA and must correct, replace, or otherwise rectify the goods alleged to be in violation of  California Civil Code section 1770.

150.    Defendant did not correct its business practices within 30 days of receiving Plaintiffs' CLRA notices. After receiving Plaintiffs' notices, Defendant requested an opportunity to inspect Plaintiffs' refrigerator. Defendant was provided an opportunity to inspect Plaintiffs' refrigerator and completed an inspection of Plaintiffs' refrigerator on Friday, August 11, 2023. Following completion of the requested inspection, on or around August 29, 2023, Plaintiffs' requested Defendant's confirmation whether or not it would rectify the defect on a classwide basis. Defendant was unwilling to correct the defect on a classwide basis. [6]

151.    In accordance with California Civil Code section 1780(d), a CLRA venue declaration is attached as Ex. D to this complaint.

### COUNT FOUR — FOURTH CAUSE OF ACTION

**Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.***

152.    Plaintiffs and the Class members hereby re-allege and incorporate by reference all previous paragraphs of this complaint as if fully set forth herein.

---

[6] Prior to the August 11, 2023 inspection, Defendant's counsel offered to replace Plaintiffs' refrigerator but did not offer any relief to other members of the putative class of similarly-situated consumers. After the August 11, 2023 inspection, Defendant's counsel offered to replace Plaintiffs' refrigerator along with additional compensation but refused to offer or provide any relief to other members of the putative class of similarly-situated consumers. Accordingly, Plaintiffs rejected the offer. Defendant's counsel has also requested a supplemental inspection of Plaintiffs' refrigerator.

153.    California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.* ("UCL"), prohibits business acts practices that are unlawful, unfair, or fraudulent and unfair, deceptive, untrue, or misleading advertising. The UCL also provides for injunctive relief and restitution for violations.

154.    Defendant has engaged in unlawful, unfair and/or fraudulent business acts and practices as set forth above.

155.    Defendant's conduct constitutes unlawful business practices because, as described herein, by knowingly manufacturing, distributing, and/or selling defective Class Refrigerators, Defendant violated California Civil Code sections 1750 and 1790 and Defendant's statutory obligations to ensure the consumer goods it places on the market are fit for their ordinary and intended purposes.

156.    Defendant's conduct constitutes unfair business practices because, as described herein, Defendant's practices have deceived and/or were likely to deceive Plaintiffs and the Class members and other members of the consuming public. At no time prior to the purchase of their Class Refrigerators were Plaintiffs or the Class informed of the RC Evaporator Defect, the defective nature of the Class Refrigerators, or of the extraordinary time and effort required to keep Defendant's products operational. Failure to disclose this information constitutes material omissions of facts that a reasonable consumer would want to know prior to the purchase of Defendant's products.

157.    Furthermore, Defendant's conduct relating to the Class Refrigerators constitutes unfair business practices in at least the following respects:

158.    Failing to exercise adequate quality control and due diligence over the Class Refrigerators before placing them on the market;

159.    Promoting and selling refrigerators it knew were defective because they contain an evaporator coil that periodically freezes over, causing refrigeration failure;

160.     Failing to disclose that the Class Refrigerators are defective while representing through advertising and through its authorized retailers that the Class Refrigerators possess qualities that Defendant knew the products did not possess;

161.     Directing repairs and furnishing replacement parts it knew would not permanently fix the defect that caused consumers to experience repeated instances of having the front of their refrigeration compartment freeze, rendering its limited warranty useless; and

162.     Refusing to acknowledge and/or disclose the existence of the RC Evaporator Defect, failing to provide consumers with adequate relief, and suggesting to authorized repair personnel that they should try to resolve the problem when Defendant knew its proposed repair methods would not be effective in fixing the RC Evaporator Defect.

163.     Defendant's conduct relating to the Class Refrigerators constitutes fraudulent business practices because Defendant knowingly failed to disclose material facts that a reasonable consumer would want to know prior to the purchase of the products. Furthermore, Defendant knowingly failed to disclose material facts that present a safety hazard to consumers in the form of the periodic failure of their refrigerators to continuously properly cool and store food.

164.     As described herein, Defendant's misrepresentations and fraudulent omissions were material. Had Plaintiffs and the Class members known that the Class Refrigerators are defective, they would not have purchased them or would have paid less for them.

165.     Defendant's practice of selling defective refrigerators without providing an adequate remedy to cure the defect—and continuing to knowingly sell those refrigerators without full and fair disclosure of the defect—harms the public at large and is part of a common and uniform course of wrongful conduct.

166.     The harm from Defendant's conduct was not reasonably avoidable by consumers. The Class Refrigerators suffer from a latent defect, and Defendant failed to disclose it even after receiving numerous consumer complaints, warranty claims, and reports of the Class Refrigerator's refrigeration

compartment's evaporator freezing and/or frosting over from its authorized repair service providers and after issuing technical service bulletins to its authorized repair service providers acknowledging the problem. Plaintiffs and the Class members did not know of, and had no reasonable means of discovering, that the Class Refrigerators are defective.

167.    Further, the injury to Plaintiffs and the Class greatly outweighs any alleged countervailing benefit to consumers or competition under all of the circumstances. The injury clearly constitutes substantial injury because the Class Refrigerators develop serious problems which require costly repairs and result in economic losses to consumers and extraordinary measures to keep the products operational. There is no benefit to the consumers by allowing Defendant to knowingly market and sell defective products without disclosing material facts that a reasonable consumer would want to know about.

168.    As a result of Defendant's unlawful, unfair, and fraudulent acts and omissions, Plaintiffs and the Class suffered injury in fact, including lost money or property. Absent Defendant's unlawful, unfair, and fraudulent conduct, Plaintiffs and the Class members would not have purchased a Class Refrigerator or would have paid less for a Class Refrigerator than they did.

169.    Through its unlawful, unfair, and fraudulent conduct, Defendant acquired Plaintiffs' and the Class members' money from Defendant's authorized sellers and/or retailers and directly from Defendant's websites.

170.    Plaintiffs and the Class members accordingly seek appropriate relief under the UCL, including restitution and such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and fraudulent practices. Plaintiffs and the Class also seek reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure section 1021.5.

## VIII.   PRAYER FOR RELIEF

171.        **WHEREFORE**, Plaintiffs and the members of the Class pray for relief and judgment against the Defendant as follows:

A.      An order certifying the proposed Class and appointing Plaintiffs and Plaintiffs' counsel to represent the Class;

B.      Actual, compensatory, restitutionary, and punitive damages in an amount to be determined at trial;

C.      Statutory damages as permitted by law;

D.      Punitive damages in an amount to be determined at trial;

E.      For any other available penalties for each illegal or fraudulent business act or practice;

F.      Injunctive and declaratory relief as permitted by law and equity, including enjoining Defendant from continuing the unfair and unlawful practices as set forth herein;

G.      Plaintiffs' reasonable attorneys' fees;

H.      Plaintiffs' and Plaintiffs' counsel's recoverable fees, costs, and expenses;

I.      Pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

J.      Such other and further relief deemed just and proper under equity or law.

## IX.      JURY TRIAL DEMAND

172.        Plaintiffs respectfully demand a trial by jury on all issues so triable.

Dated: October 5, 2023

Respectfully submitted,

*[signature]*

Alison E. Chase (SBN 226976)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

achase@kellerrohrback.com

Laura R. Gerber (*Pro hac vice* forthcoming)
Michael Woerner (*Pro hac vice* forthcoming)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384
lgerber@kellerrohrback.com
mwoerner@kellerrohrback.com

Michael J. Brickman (*Pro hac vice* forthcoming)
mbrickman@rpwb.com
James C. Bradley (*Pro hac vice* forthcoming)
jbradley@rpwb.com
Nina Fields Britt (*Pro hac vice* forthcoming)
nfields@rpwb.com
Caleb M. Hodge (*Pro hac vice* forthcoming)
chodge@rpwb.com
ROGERS, PATRICK, WESTBROOK &
BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A (29464)
Post Office Box 1007
Mount Pleasant, SC 29465
Phone:    (843) 727-6500

Kenneth Behrman (*Pro hac vice* forthcoming)
ken.behrman@behrmanlaw.com
5855 Sandy Springs Circle
Suite 300
Atlanta, GA 30328
Phone:    (770) 952-7770, Fax: (770) 952-6775

*Attorneys for Plaintiffs and the Putative Class*